Shayna Fernandez Watts (027342)
Mark Sorokin (031960)
FERNANDEZ WATTS LAW PLLC
5040 E. Shea Blvd. Ste. 272
Scottsdale, Arizona 85254
Phone: (602) 760-5100
Fax: (602) 760-5130
Shayna@FernandezWattsLaw.com
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Julie Plaintiff,<br><br>                    Plaintiff,<br><br>v.<br><br>Defendant Wholesale Corporation,<br><br>                    Defendant. | No. CV-25-00060-TUC-JGZ (LCK)<br><br>**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT.**<br><br>*Honorable Lynette C. Kimmins* |

## INTRODUCTION

Defendant Wholesale Corporation asks this Court to hold, as a matter of law, it lawfully terminated Julie Plaintiff without ever genuinely exploring whether she could continue to work. It cannot. The record reveals a textbook case of what the ADA forbids: an employer predetermined the results of the interactive process, relied on an overbroad job description, applied physical standards to Plaintiff it did not apply to her similarly situated colleagues, demanded she return to work with no restrictions, and then terminated her while its own supervisor worked alongside employees who performed the very same reduced duties Defendant told Plaintiff were indispensable. Defendant's motion rests almost entirely on declarations from witnesses whose late disclosure deprived Plaintiff of any meaningful opportunity for discovery. Defendant cannot escape that serious genuine issues of material fact remain in dispute and the motion should be denied.

## BACKGROUND FACTS

### A.    Plaintiff's Employment with Defendant

Plaintiff worked for Defendant for over six years as a Member Service Assistant ("MSA") at the Tucson warehouse. (Defendant Statement of Facts ("DSOF") ¶ 1.) Throughout her tenure, Plaintiff performed her job without incident and received no meaningful performance counseling. (Plaintiff Statement of Facts ("PSOF") ¶ 98.) Plaintiff was diagnosed with Rheumatoid Arthritis in 2011, before she began working with Defendant and continued to work for Defendant for several years until November 15, 2021. (DSOF ¶ 3; PSOF ¶ 104.) In the two years immediately before Plaintiff went on leave, she performed "fax and pull" duties four days a week and worked at the door one day a week. (PSOF ¶ 100.)) Fax and pull were not part of the duties of an MSA, but she did them anyway. (*Id.* ¶ 101.) Shortly before Plaintiff went on leave, she informed her supervisors her Rheumatoid Arthritis was flaring up. (*Id.* ¶ 103.) Defendant granted Plaintiff FMLA leave beginning in November 2021, and her FMLA leave expired on June 29, 2022.  (*Id.* ¶ 104.) Otherwise, Plaintiff took short-term and long-term medical leave. (DSOF ¶ 4.)

When she sought to return to work, Defendant initiated its job accommodation

2

process, retaining Frances Parisi as a third-party ADA consultant to coordinate Job Assessment Meetings ("JAM") between Plaintiff and Defendant.

**B.    The Job Analysis and What It Actually Describes**

Defendant's case rests on a Job Analysis ("JA") for the MSA position. The JA was prepared not by observing the work actually performed by Plaintiff or in Tucson or Arizona, but by an externally-retained consultant. (*See* DSOF ¶¶ 21-23.) The JA sets forth four Essential Functions and Tasks in addition to reliable attendance. According to the JA, 15% of the job conducts hourly safety and security checks, including walking the perimeter, pushing carts, picking up stray items, performing steel safety walks prior to openings, and performing temperature checks. (PSOF ¶ 107.) The next 40% maintains the entrance area, including greeting members, verifying membership cards, using a handheld clicker to count entering members, and reporting half-hourly to front-end managers. (*Id.* ¶ 108.) Another 40% of the job maintains the exit area by validating receipts, assisting members with items or carts, and plugging in motorized shopping carts. (*Id.* ¶ 113.) The remaining 5% involves lot rounds – driving a personal vehicle around the parking lot after hours. (*Id.* ¶ 115.) The JA also requires "[h]earing . . . to converse with members and co-workers and communicate via 2-way radio and phone." (*Id.* ¶ 116.)

**C.    What the Job Actually Requires.**

The evidence demonstrates the JA overstates the physical demands actually placed on MSAs at the Tucson warehouse. On safety walks, Plaintiff was "sometimes once a day, sometimes never" asked to perform them, noting "there's four people up there and rotating and stuff sometimes, somebody would do the walk when I would go on break." (PSOF ¶ 110.) Steel safety walks, a specific JA requirement, only occurred when opening the store, and Plaintiff did not perform steel safety walks in the two years before she took leave (*Id.* ¶ 111.)

On lot rounds, Plaintiff testified: "we never did that. We never were part of that. . . . I never did that when I worked there." (PSOF ¶ 117.) The May 2023 JAM notes confirm that Plaintiff told Defendant she had "never" seen a member service employee drive around

the lot and that "when she was here they had security that did it." (*Id.* ¶ 123.) Miller confirmed that lot rounds were location-dependent: MSAs would perform lot rounds at Defendant's Prescott, AZ location, but Defendant hired an external security company to perform lot rounds in Tucson, AZ. (*Id.* ¶ 152.)

On the handheld clicker, listed in the JA as a tool MSAs continuously operate: "[t]he only hand tools that we had were a clicker that I clicked with my thumb." (PSOF ¶ 119.) More significantly, supervisor Allison Miller testified "[h]andheld clicker we don't use anymore. Those, we got rid of awhile ago." (*Id.* ¶ 120.) Plaintiff notes she also operated a digital thermometer using one hand. (*Id.* ¶ 119.)

On assisting member with items or carts, an exit area function: "[u]sually you call the lot crew. So you just found -- you find somebody else to help. You know, hey, James, this lady needs help with her water or can you help her to her car. I didn't assist. I just had to keep checking receipts." (PSOF ¶ 109.)

Contrary to the JA suggesting the exit area constituted no more than 40% of the essential functions of an MSA, Plaintiff said maintaining the exit area "took up at least 50 percent of [her] time." (PSOF ¶ 114.) Indeed, Plaintiff "was always at the exit door." (*Id.*)

**D.    The First JAM and Defendant's Pre-Formed Conclusions**

In early 2023, Plaintiff asked to return to work with accommodations. (PSOF ¶ 127.) Instead of allowing Plaintiff to return to work on a temporary basis Defendant held a Job Assessment Review Meeting ("JAM") on May 23, 2023, after Plaintiff submitted a Work Restriction Form reflecting physical limitations. (*Id.*) General Manager Jarod McPherson, Integrated Leave Supervisor Ryan Klee, and Frances Parisi from RehabWest, Inc. attended the meeting. (DSOF ¶ 12, 13.) Defendant's policies affirmatively state it will "discuss . . . reasonable accommodations we may be able to provide to enable you to perform the essential functions of your job [and] try to assist you in identifying other jobs that are available[.] (PSOF ¶ 130.) However, McPherson told Plaintiff that she was a liability and that Plaintiff needed to be able to perform her job without restrictions. (PSOF ¶ 137.)

The Work Restriction Form stated Plaintiff could walk occasionally and stand

4

frequently. (PSOF ¶ 131.) Plaintiff could also lift 10 pounds frequently. (*Id.*) During the JAM, Klee, McPherson, and Parisi concluded Plaintiff was incapable of carrying out the essential functions of an MSA with or without accommodation. (PSOF ¶ 136.) Defendant asserted, without support, that pushing an empty shopping cart, part of Essential Functions 2 and 3, required 19 pounds of force. (*Id.* ¶ 134.) But Plaintiff could at all times push an empty Costco shopping cart. (*Id.* ¶ 135.) Defendant had "no suggestions for modifications" as to any of the essential functions. (*Id.* ¶ 136.)

JAM notes for five employees between May 2021 and July 2025 demonstrate Defendant approaches JAMs from a position of no and refuses to suggest accommodations in good faith. (*See* PSOF ¶¶ 160-166.) They do not offer or discuss alternatives. (*See id.*) These employees were identified by Defendant in response to Plaintiff's request for all documents related to any JAM meetings conducted for other employees with disabilities at Defendant's Arizona locations since January 1, 2020. Defendant agreed to the suggestion by a fifth employee ("MSA1"), an MSA, to work six-hour shifts no more than three days per week and work five hour shifts the other days. (*Id.* ¶ 166.) Plaintiff corroborates Defendant's ability to accommodate MSA1 because Plaintiff frequently observed Front End employees reassigned to relieve MSAs at closing. (*Id.* ¶ 112.) Beyond that accommodation, which Defendant refused to Plaintiff, the notes reflect Defendant's general hostility to accommodations.

On December 21, 2021, an MSA had a chronic condition that required frequent bathroom breaks. (PSOF ¶ 162.) Defendant denied accommodations were available by speculating if "she is at the front door and she needed to take a break two times per hour this could be a potential concern in her job." (*Id.*)

On July 31, 2025, a Food Service Assistant needed to use a cane and was limited to occasionally lifting/pushing/pulling 10 pounds with a 20 pound maximum. (PSOF ¶ 161.) Defendant had no suggested accommodations. (*Id.*)

On July 11, 2025, a Front End Assistant medically could not work in the sun and requested indoor work. (PSOF ¶ 164.) Defendant identified nine essential functions but

zeroed in on the one function that required outdoor work: retrieve carts and flatbeds from parking lots. During the JAM, Defendant said that "the frequency of cart collection shifts and the percentage of the shift spent performing cart collection varies with location" and speculated that the employee "could spend the entirety of his shift outside on cart crew." (*Id.*) Defendant had no suggested accommodations. (*Id.*)

Finally, on May 2, 2023, a Front End Cashier sought accommodations for lifting restrictions because "he really does not do anything with carts but once in awhile he may have to push six to eight carts in early morning. (PSOF ¶ 165.) In response, Defendant was concerned that "throughout the course of his day he could be pushing and pulling carts and flatbeds through the line." The employee said he had not worked outside in years and wanted to be accommodated by not having to push 10-15 carts at a time outside. (*Id.*) At the time of the JAM, the employee had been working the self-checkout line as a temporary transitional duty ("TTD") for "the last year or two" without issue.[1] (*Id.*) He had not been "on a register for 2.5-3 years." (*Id.*) Defendant refused to accommodate the employee. (*Id.*)

**E.    The Second JAM and Termination**

Defendant concluded, during the September 2023 JAM, it could not accommodate Plaintiff's restrictions, stating "they are looking at the job as a whole." (PSOF ¶ 138.) Following the JAM, Klee told Plaintiff that she was "going to have these no restrictions for [her] to come back." (*Id.* ¶ 128.) McPherson handed Plaintiff a blank work restriction form, and said "You know what you have to do Julie. Here is a blank restriction form and here is the answer to your test." (*Id.* ¶ 139.) Julie took this to mean she needed clearance from her doctor to return to work with no accommodations. (*Id.* ¶ 140.) Subsequently, Defendant said it could not accommodate Plaintiff's restrictions and terminated her employment on November 20, 2023. (DSOF ¶ 38.) The termination letter itself acknowledges Plaintiff's medical condition had not changed between the first and second JAMs. (*Id.*)

**F.    Comparator Evidence**

The same warehouse system within which Defendant terminated Plaintiff for failing

---

[1] Defendant argues TTD accommodations are limited to 12 weeks only. (Mot. at 10 n.7.)

6

to meet the JA's physical requirements continued to employ MSAs who performed the role without completing those same requirements.

Allison Miller, who supervised CT at the Prescott warehouse from 2018 until CT transferred, testified that CT "only did the door. At that time we had the clickers, and so she did the entrance or the exit, she did either one, but she sat in a wheelchair the whole time. So she didn't do walks. She didn't do anything but check receipts or click people in." (PSOF ¶ 153.) "I never saw her do walks. When I had the board, I never made her do walks because she was in a wheelchair." (*Id.* ¶ 154.) CT also could comply with the JA requirements: "when you're at the door, you can't lift, you know, the stuff in the cart to see what's underneath boxes. Like you can't -- you know, you can't push carts[.]" (*Id.* ¶ 156.) Notably, at CT's JAM, the notes state: "It was not necessary to review the individual functions of the position of Member Service Assistant based on the restrictions" provided by CT's doctor. (*Id.* ¶ 158.) Defendant did not subject CT to the function-by-function analysis it applied to Plaintiff. Moreover, as part of CT's accommodation, Defendant agreed in a February 1, 2017 letter that it "would not schedule [CT] three (3) consecutive eight (8) hour shifts" – the same category of scheduling adjustment Defendant categorically refused to explore for Plaintiff at either JAM. (*Id.* ¶ 157.)

Miller testified Willy Munoz "doesn't do hourly building checks. He does the one [opening walk] on his opening days, but he doesn't do them throughout." (PSOF ¶ 148.) Miller has "[n]ot once in three years" seen Munoz work the exit door. (*Id.* ¶ 149.) Miller reviewed the JA and confirmed Munoz does not perform exit duties, lot rounds, making sure workers make it to their cars safely, or watching closing managers leave. (*Id.* ¶ 148.) As a supervisor, Miller has never instructed Munoz to perform a job duty other than the front door. (*Id.* ¶ 147.) The understanding among supervisors was simply: "Hey, Willy just does the entrance door." (*Id.*)

## ARGUMENT

### A.    Defendant failed to reasonably accommodate Plaintiff

Defendant correctly states the test for summary judgment but incorrectly

7

characterizes the evidence in the record as not a "scintilla of evidence" and "conclusory allegations." (Motion at 6, *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) *and Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003). A defendant's ability to accommodate a plaintiff is frequently a question for the jury and the record contains ample evidence Defendant did not meet its obligation to properly identify the essential functions of an MSA and to analyze in good faith whether it could accommodate Plaintiff's restrictions. Therefore, summary judgment is inappropriate.

### 1.     The Essential Functions Must be Properly Identified

To survive summary judgment, Plaintiff must demonstrate she is a qualified individual with a disability who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires" 42 U.S.C. § 12111(8). "If a disabled person cannot perform a job's 'essential functions' (even with a reasonable accommodation), then the ADA's employment protections do not apply. *Cripe v. City of San Jose*, 261 F.3d 877, 884 (9th Cir. 2001). To that end, "[w]hether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014) (internal quotations omitted.)

The essential functions of a job are its fundamental duties, not its marginal functions. *Cripe*, 261 F.3d 887, *quoting* 29 C.F.R. § 1630.2(n)(1). A written description of the job is relevant but not conclusive evidence. *Id.* Courts view such descriptions cautiously because too much deference risks allowing employers to "turn every condition of employment . . . [into] an essential job function, merely by including it in a job description." *Id.*, *quoting Echazabal v. Chevron USA, Inc.*, 226 F.3d 1063, 1071 (9th Cir. 2000).

Relevant evidence includes (a) the amount of time spent performing the function; (b) the consequences of not performing the function; (c) the terms of a collective bargaining agreement; (d) the work experience of past incumbents; and/or (e) current work experience of incumbents. 29 C.F.R. § 1630.2(n)(3)(iii)-(vii). The job description must be "solidly anchored in the realities of the workplace, not constructed out of whole cloth." *Gillen v.*

*Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 25 (1st Cir. 2002). Importantly, "'[e]ssential functions are not to be confused with 'qualification standards,' which an employer may establish for a certain position. Whereas 'essential functions' are basic 'duties,' 'qualification standards' are 'physical, medical, [and] safety' requirements." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007), quoting 29 C.F.R. §§ 1630.2(n)(1) & (q).

### 2. Defendant Overstates the Essential Functions of an MSA.

The Ninth Circuit rejects the notion a function required for some employees but not all is an essential function. *Cripe*, 261 F.3d at 887-888. In *Cripe*, the Ninth Circuit credited affidavits from a sergeant and a former chief of police asserting making arrests was not "for all practical purposes" part of being a fraud investigator or an essential function of training officers. *Id.* at 887. Testimony from a police captain asserting "being an investigator is a very active job" and was "quite physically demanding" only created a genuine issue of material fact that precluded summary judgment on the question of whether forcible arrests were required for all police officers. *Id.* at 887-88.

In *EEOC v. LHC Group, Inc.*, the Fifth Circuit rejected the employer's assertion that driving was an essential function of the job because first-hand experience suggested that traveling was not as prominent as suggested, creating "a genuine dispute of material fact as to whether driving was an essential function of that position." 773 F.3d 688, 697 (5th Cir. 2014). Similarly, the First Circuit rejected a job description, explaining it "had been drafted on the basis of observations made by a member of the [employer, that] reported on a historical fact – how EMT work traditionally has been performed[.]" *Gillen*, 283 F.3d at 28. The description was relevant but not conclusive. *Id.*

First-hand experience from Plaintiff and Miller shows the JA is not reliable evidence of the essential functions of an MSA. (PSOF ¶¶ 110-114, 119, 122, 125, 126, 148-150.) Similar testimony in a recent case gave rise to a dispute of material fact. *Ruch v. Costco Wholesale Corp.*, No. 24-cv-05410-TSH (N.D. Cal. Jan. 14, 2026). The *Ruch* court found the plaintiff's assertion she never needed to work beyond two front end registers sufficient

to defeat Costco's argument it was an essential function of a Front End Cashier to be able to work all registers, including self-checkout registers. *Id.* at *21. Referring to the JA in that case, the court agreed with *Echazabal* that "an employer may not turn every condition of employment which it elects to adopt into an essential job function, merely by including it in a job description." *Id.*[2] Similarly, Defendant's citation to Plaintiff's testimony regarding the essential functions of an MSA cannot prevail. (Motion at 7:19-27.) On identical facts, "Costco's assertion that Ruch concedes that [the JA] contains the essential functions of her position does not move the needle . . . she did not make a legal determination as to whether those duties were essential functions." *Ruch*, 24-cv-05410-TSH, at *21.

To begin with, Plaintiff testified she never performed lot rounds. (PSOF ¶¶ 117, 123.) Miller confirmed employees in Tucson did not have to perform lot rounds, which were outsourced to a third-party security company. (*Id.* ¶ 152.) At five percent of the duties, lot rounds cannot be anything but the definition of marginal.

Miller is a supervisor for Defendant in Tucson. (PSOF ¶¶ 144, 146.) Testimony from a "supervisor that a job functional is actually marginal may effectively rebut a written description that states that a job function is essential." *Rorrer*, 743 F.3d at 1040.

The JA considers perimeter walks for safety and security 15% of an employee's day (PSOF ¶ 107). Plaintiff and Miller demonstrate that perimeter checks and safety walks are not required of an MSA, especially not one who never opened the store. (*Id.* ¶¶ 110, 111; 148.) Miller testified that CT did not do safety walks because she was in a wheelchair. (*Id.* ¶¶ 153, 154.) Defendant did not even require Munoz, an MSA with no physical restrictions, to perform safety walks throughout the day. (*Id.* ¶¶ 148, 149.)

The JA asserts entrance area and exit area duties consist of 80 percent of the job, but Plaintiff said these two functions constitute 90 percent of the job. (PSOF ¶ 126.) These are tasks Defendant allowed at least two other employees to exclusively perform. Any suggestion additional tasks should be deemed an essential function of the job runs contrary

---

[2] *Ruch* relies on language in decisions that trace back to *Echazabal*.

to the evidence. Further, Plaintiff disputes both functions with respect to any weight requirement; CT did not lift "stuff in the cart to see what's underneath boxes" or push carts and Plaintiff could push an empty shopping cart at all times. (*Id.* ¶¶ 135, 156.) Miller ticked off several functions in the JA that employees, including Munoz, never performed under her supervision. (*Id.* ¶ 149.) Plaintiff asked to be accommodated by allowing her to perform entrance and exit area duties. (*Id.* ¶ 127.)

At most, Defendant suggests it asked Munoz to do more. (DSOF ¶ 95.) However, that statement defeats summary judgment for three reasons. First, it both corroborates and increases the credibility of Miller's testimony that Munoz does not perform the functions Defendant argues should be essential and applied to Plaintiff. Second, Defendant admits Munoz does not regularly perform safety walks despite having no known restrictions and does not suggest undue hardship or subpar performance. Third, Defendant admits Munoz does not perform exit area duties and only once since 1991, suggested that he "could do more floor walks [safety walks] during the day and help out [at] the exit door more" (DSOF ¶ 95 (alteration in original).) That runs contrary to the JA's framing of the "essential" job functions. Defendant holds Munoz to a lower standard than Plaintiff, which demonstrates a genuine dispute of material fact as to whether Defendant could have accommodated Plaintiff, not only in 2023, but at any time while Plaintiff was on leave. Plaintiff could have worked the entrance and the exit areas like Munoz, sat as needed and refrained from lifting, like CT, or worked 5 hour shifts, like MSA1. Defendant denied and deliberately ignored any possible accommodation.

In *Freeman v. Learning Care Group*, Case No. 18-CV-13720 (E.D. Mich. Aug. 20, 2020), the court denied summary judgment when the employer refused the plaintiff flexibility to work from home due to the plaintiff's asthma interacting with construction debris and terminated her employment. *Id*. at *8-10. The plaintiff showed that the company allowed two employees in the same position to telework frequently. *Id.* at 10. That flexibility demonstrated "in-person attendance was a marginal, rather than an essential, function of the job." *Id.* at 20.

11

Munoz does not perform walks throughout the day and does not perform safety checks other than the one morning safety check. CT did not have to lift any heavy items and was not required to stand throughout the day. That Defendant permitted both employees to avoid performing anything but working at the exit and entrance areas demonstrate that the remainder of the JA functions cannot be anything but marginal. Indeed, MSA1's ability to work five-hour shifts shows Defendant's insistence on scheduling flexibility is not grounded in reality. Since exhausting her medical leave, Plaintiff consistently requested to perform the essential functions of an MSA and was denied. For this reason, summary judgment is inappropriate.

### 3.  Plaintiff was a qualified individual with a disability.

Defendant's argument that Plaintiff was not a qualified individual with a disability misapprehends the legal standard and ignores crucial evidence in the record. When considered in the light most favorable to Plaintiff, as the non-moving party, there exist genuine disputes of fact for which summary judgment is not appropriate.

### i.  Plaintiff could perform the essential functions of the MSA position *with or without* reasonable accommodation.

Defendant argues that Plaintiff could not perform "physical activities" of an MSA *without* a reasonable accommodation. (Motion, at 7:17-18.) That is not the relevant inquiry. Rather, under the ADA, qualified individuals must be able to perform the essential functions of the job "with or without" reasonable accommodation. 42 U.S.C. § 12111(8). Defendant seeks approval of a "no restriction" policy, a *per se* violations of the ADA. *McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 1113, 1116 (9th Cir. 1999) (collecting cases). Indeed, Plaintiff provided unrebutted testimony that Klee said she could only return to work without any restrictions. (PSOF ¶ 128.) Defendant subsequently hedges its bets by arguing that Plaintiff also could not perform the essential functions of the MSA position with a reasonable accommodation. (Motion, at 9:23-24.) For reasons already explained, Defendant overstates the essential functions of the MSA position and cannot prevail.

As demonstrated above, the JA does not accurately depict the essential functions of

an MSA. Defendant's reliance on *Dooley v. Nevada Gold Mines, LLC*, No. 3:21-cv-00126-LRH-CSD, 2023 WL 7279993 (D. Nev. Nov. 3, 2023) and *Cummings v. U.S. Postal Service*, 700 F. Supp. 3d 801 (D. Ariz. 2023) wrongly assumes that the essential functions of an MSA is a *fait accompli*. *Dooley* engaged in a fact-specific analysis and accepted the company's written job description because it was supported by a Job Capability Study and "corroborated by various deponents and their testimony, including Dooley." 2023 WL 7279993, at *7. The *Cummings* plaintiff did not contest any of the alleged essential functions of a mail carrier. 700 F. Supp. 3d at 807. Here, the record includes first-person observations from Plaintiff and Miller demonstrating Plaintiff's performance on the job and the performances of other disabled and non-disabled employees reveal the essential functions of the job to be vastly less than Defendant suggests. Defendant does not present any controverting evidence or testimony to suggest that Munoz, CT, or MS1 performed their functions inconsistent with Plaintiff's or Miller's depositions.

For two years, as an MSA, Plaintiff performed fax-and-pull duties four days a week in addition to working the door once a week. (PSOF ¶ 100.) The record is devoid of any testimony or suggestion that fax-and-pull duties were a normal part of the MSA position, let alone an essential function. Therefore, for two years, Defendant permitted Plaintiff to perform non-MSA duties while being at work as an MSA. At the time Defendant terminated Plaintiff, she had requested to perform her MSA duties because she was more than capable of standing at the entrance door and checking people in as Munoz near-exclusively performs as an MSA, sitting at the exit door and checking customer receipts without needing to lift heavy packages, as CT does, and doing so for five hours as MSA1 does. Defendant refused to allow Plaintiff the same flexibility it extends to Munoz, CT, and MSA1.

## ii. Defendant's seniority argument is unsupported and speculative.

Defendant connects three dots: Plaintiff needed to work a fixed schedule limited to five hours between the hours of 9:00 a.m. to 5:00 p.m.; 78.6 percent of Plaintiff's shifts exceeded 5 hours; and she was sixth on the seniority list. However, there is no evidence

Defendant discussed scheduling with Plaintiff during either JAM or allowed Plaintiff to return to work. Such speculative thinking and assumptions does not comport with the ADA. *Dark v. Curry County*, 451 F.3d 1078, 1086 (9th Cir. 2006). Without discussing scheduling with Plaintiff or permitting her to return to work on a trial basis, Defendant has no facts on which to assert that Plaintiff could not work within Defendant's scheduling, especially in light of consistent evidence in the record that Defendant asked Plaintiff to discuss her restrictions with her doctor, but not her schedule.

Defendant's citations to *Sepulveda-Vargas v. Caribbean Restaurants, LLC*, 888 F.3d 549 (1st Cir. 2018) and *Daniels v. Wal-Mart Associates*, No. 19-11357, 2021 WL 916088 (D. Mass. Feb. 18, 2021) shine no light on the matter. Sepulveda-Vargas, as one of three assistant managers, did not contest that she needed to be able to rotate morning, day, and evening shifts. *Sepulveda-Vargas*, 888 F.3d at 552, 554. The First Circuit emphasized that the analysis requires fact-sensitive considerations and must be determined on a case-by-case basis. *Id.* at 553 (internal quotations and citations omitted). The *Daniels* plaintiff held a unique job and needed to be able to train employees who only worked evening and weekend shifts. 2021 WL 916088, at *9. The varied duties of an MSA, as reflected by Plaintiff's prior fax-and-pull duties, Munoz's focus on the entrance area, CT's focus on checking customer receipts at the exit area, and Defendant's ability to accommodate a third employee's request for five-hour shifts demonstrate the lack of specificity present in *Sepulveda-Vargas* and *Daniels*. (*See* PSOF ¶ 166.)

Defendant's seniority argument is similarly speculative and incomplete. While Defendant asserts that Plaintiff was sixth on the seniority list, it does not identify the depth of the seniority list or discuss whether that list was capable of changing over time. Moreover, Defendant does not identify whether Plaintiff's seniority was affected by her leave status, i.e., had Defendant accommodated Plaintiff from the start, in November 2021, she may have benefited from an improved seniority status, rendering this argument moot. Defendant relies on the number six without context.

### iii.    Defendant improperly cites to Social Security benefits.

14

Defendant implies that, because Plaintiff received Social Security Disability payments ("SSDI"), she must be disabled to the point where she is unable to perform the essential functions of an MSA. (Motion at 2 n.1.) However, applying for or receiving disability benefits from the Social Security Administration does not preclude an ADA claim. *Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795 (1999). Moreover, Plaintiff did not receive SSDI benefits until 2024, well after Defendant terminated her employment. (PSOF ¶ 170.) Thus, whether the Social Security Administration considers Plaintiff disabled has no bearing on this Court's inquiry.

### 4. Defendant Failed to Engage in the Interactive Process

Defendant did not engage in the interactive process in good faith. The interactive process requires that "the employer . . . engage in [an] interactive process so that *together* they can determine what reasonable accommodations might be available." *LHG Group*, 773 F.3d at 699, *quoting E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606 622 (5th Cir. 2009) (emphases and alterations in original.) As the *Rorrer* court aptly explained:

> failing to assist an employee in seeking an accommodation may suggest bad faith. *Canny v. Dr. Pepper/Seven–Up Bottling Grp., Inc.*, 439 F.3d 894, 902 (8th Cir. 2006). This Court held in Keith that a cursory medical examination and summary conclusion that a disabled individual is not fit for employment violates an employer's duty to engage in the interactive process in good faith. 703 F.3d at 924.

*Rorrer*, 743 F.3d at 1040-41; *see Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1115 (9th Cir. 2000) (requiring a "good faith exploration of possible accommodations"), *vacated on other grounds*, *U.S. Airways Inc. v. Barnett*, 535 U.S. 391 (2002). The employer should "show some sign of having considered [the] request, and offer and discuss available alternatives when the request is too burdensome." *Barnett*, 228 F.3d at 1115 (internal quotations and citations omitted). Summary judgment is not available when there is a genuine dispute as to whether the employer engaged in the interactive process in good faith. *Id.* at 1116.

The Ninth Circuit requires that the employer (1) directly communicate with the employee to explore in good faith the possible accommodations; (2) consider the employee's request; and (3) offer a reasonable and effective accommodation. *Zikovic v. S.*

*Cal. Edison Co.*, 301 F.3d 1080, 1089 (9th Cir. 2002), *citing Barnett*, 228 F.3d at 1114-15. Rejecting an employee's suggested reasonable accommodation without suggesting alternative solutions or exploring other accommodations violates the employer's duty under the ADA. *Humphrey v. Mem. Hosps. Assoc.*, 239 F.3d 1128, 1138-39 (2001).

The JAM notes for Plaintiff and several other employees demonstrate an adversarial setting whereupon Defendant shifted the burden entirely on the employees to demonstrate that they could perform each and every element of the JA. (PSOF ¶¶ 160-166.) Defendant did not assist Plaintiff in identifying any potential accommodation. Rather, it issued the same denial as with several other employees: do not pass Go. Take leave. Klee told Plaintiff that she needed to have no restrictions and McPherson told Plaintiff that she needed to come back with a clean work restriction form. Such a directive does not comply with the ADA and cannot immunize Defendant from liability.

The JAM notes from Plaintiff and others show that Defendant did not engage in the interactive process in good faith. *Johnson v. Paradise Valley Unified School District*, 251 F.3d 1222, 1228 (9th Cir. 2001), *citing McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 1113, 1116 (9th Cir. 1999). *Johnson* explained that the words, "100% healed" or "fully healed" does not constitute an individualized assessment and constitutes an employer's abdication of the interactive process. *Id.*

## B.   Defendant Improperly Considered Plaintiff's FMLA-protected leave.

Defendant misapprehends the standard when it argues Plaintiff cannot demonstrate that her termination "was false or otherwise a pretext for a retaliatory motive." (Motion, at 14:13-14.) In the 9th Circuit, claims of FMLA retaliation require Plaintiff to show she (1) took or requested protected leave; (2) Defendant subjected Plaintiff to an adverse action; and (3) the protected leave was a "negative factor" in the adverse employment action. *Schultz v. Wells Fargo Bank*, 970 F. Supp. 2d 1039, 1053 (D. Or. 2013), *citing Bachelder v. Am. W. Airlines*, 259 F.3d 1112, 1125 (9th Cir. 2001). Here, Defendant does not dispute that Plaintiff was approved for FMLA leave between November 2021 and November 2022 (PSOF ¶ 104), or that Plaintiff's termination was an adverse action.

Plaintiff's FMLA leave was a "negative factor" in her termination. *Schultz* acknowledged that temporary proximity can support causation on this point, recognizing periods of three months to one year. *Id.* at 1056-57. However, *Schultz* cautioned against a bright line because "some retaliators prefer to take their time . . . they may wait until they think the lapse of time disguises their true motivation." *Id.* at 1057, *quoting Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003) (alterations added). When an employer considers FMLA protected leave *and* non-FMLA protected leave as reasons for an adverse action, the employer runs afoul of FMLA protections. *Jadwin v. County of Kern*, 610 F. Supp. 2d 1129, 1160-66 (E.D. Cal. 2009). As the moving party, Defendant bears the burden of demonstrating that no reasonable factfinder could conclude that Plaintiff's FMLA leave was a factor in her termination. However, Defendant does the opposite.

In his declaration McPherson states unambiguously, "[b]y that time, November 2023, Nelson-Smith had been on a leave of absence for *two years* and remained unable to return to her MSA position with or without accommodation. . . . *As a result*, Costco terminated Nelson-Smith's employment[.]" (DSOF ¶ 39; PSOF ¶ 167 (emphases added).) Defendant cannot state it terminated Plaintiff's employment because of two years' worth of absences without considering her FMLA protected leave from November 14, 2021 to November 2022. McPherson's declaration is consistent with record evidence: a letter he sent to Plaintiff on September 26, 2023, suggesting Plaintiff may be terminated in part because she has "been on a leave of absence since November 15, 2021" (PSOF ¶ 168), and Parisi's JAM notes on September 26, 2023, that references Plaintiff's "Leave of Absence since November 15, 2021[.]" (*Id.* ¶ 169.) By definition, Plaintiff's FMLA leave was a "negative factor" in her termination. *See Jadwin*, 610 F. Supp. 2d at 1166.

Defendant's cases do not support summary judgment; the discussion in *Kelley v. Amazon.com, Inc.*, 652 Fed. App'x 524 (9th Cir. 2016) was limited to a skeleton discussion of proximity for FMLA interference regarding the use of intermittent FMLA leave, without more. Similarly, no other evidence existed beyond the passage of time in *Wood v. Gilman Bldg. Prods. Inc.*, 769 F. App'x 796 (11th Cir. 2019).

## C.    Costco Breached the Implied Covenant of Good Faith and Fair Dealing.

Plaintiff does not dispute the standard articulated by Defendant but disputes that summary judgment is appropriate. Defendant's employment policies affirmatively require that it will "discuss . . . reasonable accommodations we may be able to provide to enable you to perform the essential functions of your job [and] try to assist you in identifying other jobs that are available[.] (PSOF ¶ 130.) Defendant failed to follow its policies to the extent it exceeds the minimum obligations imposed by the ADA because Defendant did not in good faith discuss reasonable accommodations by operating from a position of "no."

Not only has Defendant failed to engage in the interactive process. Plaintiff asserts that McPherson injured the rights Plaintiff possessed through Defendant's policies guaranteeing that it would affirmatively discuss and provide reasonable accommodations by telling her to falsify medical records. (PSOF ¶ 139); *see Wagenseller v. Scottsdale Mem. Hosp.*, 710 P.2d 1025, 1038 (Ariz. 1985); *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 334 (3rd Cir. 2003) (employer falsification or manipulation of records constitutes a breach). Further, Defendant cannot demonstrate it fairly assisted Plaintiff in identifying suitable positions for reassignment as required by its policy.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendant's Motion in its entirety. Genuine disputes of material fact pervade every claim in this case: whether Defendant overstated the essential functions of the MSA position and refused to recognize Plaintiff as a qualified individual with a disability capable of performing the essential functions of her job, whether it failed to engage in the interactive process in good faith, and whether her FMLA-protected leave was an impermissible negative factor in her termination. Resolution of these disputes belongs to a jury.

RESPECTFULLY SUBMITTED this 30th day of June 2026.

FERNANDEZ WATTS LAW PLLC

/s/ *Mark Sorokin*

18

5040 E. Shea Blvd. Ste. 272
Scottsdale, Arizona 85254
*Attorneys for Plaintiff*