Shayna Fernandez Watts (027342)
Mark Sorokin (031960)
FERNANDEZ WATTS LAW PLLC
5040 E. Shea Blvd. Ste. 272
Scottsdale, Arizona 85254
Phone: (602) 760-5100
Fax: (602) 760-5130
Shayna@FernandezWattsLaw.com
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Julie Nelson-Smith, | No. CV-25-00060-TUC-JGZ (LCK) |
| Plaintiff, | **PLAINTIFF'S CONTROVERTING STATEMENT IN RESPONSE TO STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT COSTCO'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Costco Wholesale Corporation, | |
| Defendant. | **- AND –** |
| | **PLAINTIFF'S SEPARATE STATEMENT OF FACTS IN OPPOSITION TO SUMMARY JUDGMENT** |
| | *Honorable Lynette C. Kimmins* |

**I.   PLAINTIFF'S CONTROVERTING STATEMENT OF FACTS TO DEFENDANT'S STATEMENT OF MATERIAL FACTS**

1. Not disputed.

2. Not disputed.

3. Not disputed.

4. Disputed to the extent that Anthony Stover's declaration is inadmissible pursuant to Fed. R. Civ. P. 26(a)(3) because Defendant did not disclose Stover as a fact witness until late in

the day on the final day of discovery, giving Plaintiff no opportunity to consider whether to depose Stover or serve discovery on Defendant with respect to Stover's involvement. (Scheduling Order, Docket No. 22, at 2; Order, Docket No. 32, at 1; Email from C. Baggett to S. Watts, March 16, 2026, at 10:09 a.m., Defendant's Initial Disclosures, March 26, 2025, and Defendant's Amended Initial Disclosures, March 20, 2026, collectively attached as Exhibit 1). Plaintiff further disputes the Stover Declaration to the extent it purports to set forth the essential functions of an MSA because Stover does not have first-hand experience of the duties of a MSA at the Tucson warehouse. As admitted therein, Stover provides an explanation of what a third-party company allegedly observed. Stover provides no statement that he personally observed the duties of an MSA. The entirety of Stover's declaration is hearsay and cannot be admitted.

5. Not disputed that Plaintiff was found disabled by the SSA and is receiving SSA disability benefits. Plaintiff notes that the SSA disability standard differs from the ADA "qualified individual" standard, and this fact does not establish that Plaintiff was unable to perform the essential functions of the MSA position with a reasonable accommodation.

6. Disputed to the extent this fact relies on Stover's declaration. *See* Response to Fact 4, *supra*.

7. Disputed to the extent this fact relies on Stover's declaration. *See* Response to Fact 4, *supra*. Not disputed that Costco's policy provides for a leave of absence of up to one year. Plaintiff notes that Costco itself extended her leave multiple times beyond one year and may not rely on a policy it voluntarily waived as a per se basis for termination.

8. Disputed because this fact relies on Stover's declaration, *See* Response to Fact 4, *supra*.

9. Not disputed.

10. Not disputed.

11. Not disputed.

12. Not disputed.

13. Not disputed that Frances Parisi attended both JAMs and prepared documentation. Disputed to the extent this paragraph implies the documentation was complete and accurate

and omits the fact asserted in Defendant's Statement of Facts ¶¶ 16 and 17. Moreover, RehabWest is retained and paid by Costco, and the completeness of Parisi's notes is a disputed factual matter.

14. Disputed to the extent this fact relies on Stover's declaration. *See* Response to fact 4, *supra*. Not disputed to the extent this fact relies on McPherson's declaration.

15. Not disputed.

16. Not disputed.

17. Disputed in part. The statement mischaracterizes the scope of Plaintiff's deposition testimony. Plaintiff confirmed that the JAM documentation is accurate only with her addendum added — an addendum Plaintiff submitted precisely because Parisi's notes omitted material statements made at the September JAM. The accuracy and completeness of the September JAM notes without the addendum is a disputed factual matter.

18. Not disputed.

19. Not disputed.

20. Disputed to the extent this fact relies on Stover's declaration. *See* Response to Fact 4, *supra*. Not disputed as a general description of Costco's JA system.

21. Disputed to the extent this fact relies on Stover's declaration. *See* Response to Fact 4, *supra*. Plaintiff notes Stover asserts that Briotix is retained and paid by Costco.

22. Disputed to the extent this fact relies on Stover's declaration. *See* Response to Fact 4, *supra*.

23. Disputed to the extent this fact relies on Stover's declaration. *See* Response to Fact 4, *supra*.

24. Disputed to the extent this fact relies on Stover's declaration. *See* Response to Fact 4, *supra*. Plaintiff further notes that the JA was revised in January 2021 based on a May 2020 frequency assessment, conducted more than a year before Plaintiff went on leave in November 2021, and does not purport to reflect how Plaintiff or any Tucson MSA specifically performed their duties. (*See* Plaintiff's Statement of Facts ("PSOF") ¶¶ 8-13.)

25. Not disputed to the extent this fact refers to the position as described in the JA. Disputed

that the JA accurately describes the position.

26. Not disputed to the extent this fact refers to the position as described in the JA. Disputed that the JA accurately describes the position.

27. Not disputed to the extent this fact refers to the position as described in the JA. Disputed that the JA accurately describes the position.

28. Not disputed to the extent this fact refers to the safety walk as described in the JA. Disputed that the JA accurately describes the position.

29. Not disputed to the extent this fact refers to the JA's characterization of the MSA position. Disputed that the JA accurately describes the position; whether a function is an essential function is a question of law.

30. Not disputed to the extent this fact refers to the JA's characterization of the MSA position. Disputed that the JA accurately describes the position.

31. Not disputed to the extent this fact refers to the JA's characterization of the physical requirements for the MSA position. Disputed that the JA identifies essential functions. *See Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014).

32. Disputed in part. Defendant's characterization is incomplete. While Plaintiff agreed the JA accurately describes the physical activities, Plaintiff testified at her deposition that she believes she was only required to lift greater than 10 pounds occasionally (approximately 20 percent of her shift), not frequently, as stated in the JA. The frequency of lifting demands in the JA is disputed. Moreover, Plaintiff noted that she is not an expert regarding the essential functions of a job and upon further review, was confused by the numbers identified in the JA. (DSOF Ex. 1, Nelson-Smith Dep. at 99:8-100:4).

33. Disputed as it mischaracterizes Plaintiff's testimony. Plaintiff did not testify that she was required to lift more than ten pounds "occasionally." Rather, Plaintiff testified that she was required to lift more than ten pounds "Very rarely. I mean, maybe 20 percent of the time. But very rarely." (DSOF Ex. 1, Nelson-Smith Dep. at 104:16-17.) Plaintiff further notes that this paragraph confirms a genuine dispute of material fact: if the frequency of physical demands in the JA is overstated, the entire chart comparing Plaintiff's November

WRF restrictions to the JA's requirements is materially unreliable.

The Physical Activities chart is disputed because it assumes as fact that the physical activities and the lifting requirements identified therein are essential functions of the MSA position.

34. Not disputed that Costco concluded Plaintiff was unable to perform the essential duties of the MSA position at the conclusion of the September JAM. Disputed to the extent this paragraph implies that conclusion foreclosed further interactive process. The September JAM notes reflect that Plaintiff was directed to obtain an updated WRF and bring it to Costco so they could "look at the information at that time." (DSOF Ex. 13, CNS 000636). The JAM did not end the interactive process; it contemplated further engagement.

35. Not disputed.

36. Not disputed.

37. Not disputed.

38. Not disputed.

39. Disputed in part. The stated reason for termination was that Plaintiff remained unable to return to work with or without a reasonable accommodation. This characterization is disputed in that the Termination Approval Request states only "Employees' work restriction could not be accommodated," with no individualized analysis of the changed standing restriction in the November WRF. (Ex. 3, CNS 001857).

40. Not disputed.

41. Not disputed.

42. Not disputed.

43. Disputed in part. The statement selectively characterizes deposition testimony; Plaintiff's response to the question was, "I'm not able to answer that exact right now." (DSOF Ex. 1, Nelson-Smith Dep. at 92:22-23.) and refers to Plaintiff's answer to Defendant's question that was objected to on the basis of form and foundation. Indeed, Plaintiff's lack of certainty as to Costco's subjective motivation for retaliation does not establish that Costco's FMLA interference or ADA failure-to-accommodate conduct was

lawful. The admissible evidence regarding the adequacy of Costco's interactive process is set forth in Additional Facts below.

44. Disputed and immaterial. Plaintiff's inability to identify specific written policies Costco failed to follow does not establish that Costco complied with its legal obligations under the ADA or FMLA. Whether Costco engaged in a good-faith interactive process is a legal and factual question not resolved by this testimony.

45. Not disputed.

46. Not disputed.

47. Not disputed.

48. Not disputed to the extent this fact does not rely on Stover's declaration. *See* Response to Fact 4, *supra*.

49. Not disputed to the extent this fact does not rely on Stover's declaration. *See* Response to Fact 4, *supra*.

50. Not disputed.

51. Not disputed.

52. Not disputed that Plaintiff testified that "every single one" of the posted positions required physical activities she could not perform. Plaintiff notes this is consistent with her position that none of the postings sent by Costco were compatible with her restrictions, and that the burden to identify and offer a vacant suitable position lay with Costco.

53. Disputed. Whether Plaintiff was obligated to independently access Costco's job bank to satisfy Costco's reassignment duty is a legal question. Defendant's characterization improperly shifts to Plaintiff the employer's duty under the ADA to identify and offer vacant positions for reassignment.

54. Not disputed as a characterization of Plaintiff's deposition testimony.

55. Disputed. The job postings to which Defendant cites, CNS 2108-2112, do not identify any physical requirements associated with the position.

56. Not disputed.

57. Not disputed that Plaintiff did not take steps to apply for the optical position.

6

58. Not disputed. Plaintiff notes that this paragraph itself identifies a disputed material fact: Plaintiff testified that although she remembers receiving a posting for an optical position, she thought the posting was for a management position in the optical department. (DSOF Ex. 1, Nelson-Smith Dep. at 40:1–7). Whether this misunderstanding resulted from an ambiguous or inadequately communicated posting, and whether Plaintiff's failure to apply was therefore reasonable, is a question of fact for the jury.

59. Not disputed.

60. Not disputed.

61. Disputed. This fact relies on Stover's declaration. *See* Response to Fact 4, *supra*.

62. Disputed. This fact relies on Stover's declaration. *See* Response to Fact 4, *supra*.

63. Disputed in part because this fact relies on Stover's declaration, *see* Response to Fact 4, *supra*, and in part due to the extent Defendant characterizes scheduling flexibility as an "essential function of part-time employment at Costco" as though it were an undisputed fact. That characterization is a legal conclusion. The evidentiary basis for the assertion — Anthony Stover's declaration — is inadmissible, self-serving, and not independently corroborated.

64. Not disputed as to the text of the Employee Agreement. Disputed to the extent the text is offered as a legal conclusion as to the essential functions of the position.

65. Not disputed.

66. Not disputed.

67. Not disputed.

68. Disputed. Ed Hong's ("Hong") declaration is inadmissible pursuant to Fed. R. Civ. P. 26(a)(3) and because Defendant did not disclose Hong as a fact witness at any time prior to its Motion for Summary Judgment, in contravention of this Court's Order. (Scheduling Order, Docket No. 22, at 2; Order, Docket No. 32, at 1; *see* Ex. 1). Moreover, Defendant did not produce the underlying statistical data until May 6, 2026, more than a month after the close of discovery.

Further, to the extent Defendant plans to rely on Hong as an expert witness,

Defendant did not disclose his identity or area of expertise prior to any applicable deadline. (*Id.*) Therefore, without sufficient ability to review the statistical data underlying Hong's declaration or the statistical compilation that resulted, Plaintiff must dispute every aspect of this fact. To the extent the Court deems the fact material and admissible, Plaintiff observes that these statistics were compiled by a Costco employee (Hong) from Costco's own payroll system and reflect historical scheduling patterns before Plaintiff's leave, not the requirements of the MSA position going forward. Moreover, to the extent it is believed, the statistical compilation demonstrate a genuine issue of material fact as to whether working more than five hours per shift constitutes an essential function of the position because they demonstrate that more than 20% of the time, Plaintiff was not required to work in excess of five hours.

69. Disputed with the same arguments set forth in Fact 68, *supra.*

70. Disputed in part. Plaintiff's deposition testimony that she does not know of another part-time employee allowed a fixed midday schedule reflects lack of personal knowledge, not an affirmative concession that such a schedule cannot be accommodated. Whether a fixed midday schedule would constitute an undue hardship to Costco is a factual question not resolved by this testimony.

71. Not disputed as to the text of the Employee Agreement.

72. Not disputed as to the text of the Employment Agreement.

73. Not disputed to as to Plaintiff's seniority status. Disputed as to whether Plaintiff's seniority status constitutes a fact that precluded Defendant's ability to accommodate Plaintiff. Plaintiff's status as 6th in seniority is provided without context as to the total number of part-time MSAs and the total positions and/or shifts that a MSA could occupy at any given time.

74. Disputed. Whether allowing Plaintiff to work a fixed midday schedule would have "violated" the seniority system — or merely required an exception — is a disputed factual and legal question. Costco's own comparator evidence shows that CT received a scheduling accommodation (no three consecutive eight-hour shifts) that also modified

standard scheduling expectations. See PSOF ¶¶ 156-158, *infra*.

75. Not disputed as a characterization of the September JAM notes.

76. Not disputed as a characterization of Costco's response at the September JAM.

77. Not disputed.

78. Not disputed as to Klee and McPherson's statement. Disputed as to whether Plaintiff's seniority status constitutes a fact that precluded Defendant's ability to accommodate Plaintiff. Plaintiff's status as 6th in seniority is provided without context as to the total number of part-time MSAs and the total positions and/or shifts that a MSA could occupy at any given time.

79. Not disputed as to Klee and McPherson's statement. Disputed as to whether Plaintiff's seniority status constitutes a fact that precluded Defendant's ability to accommodate Plaintiff. Plaintiff's status as 6th in seniority is provided without context as to the total number of part-time MSAs and the total positions and/or shifts that a MSA could occupy at any given time.

80. Not disputed as a characterization of Plaintiff's deposition testimony regarding tasks she believed she could perform.

81. Not disputed that Plaintiff identified two other MSAs she believes received accommodations. Disputed as to Defendant's characterization of these accommodations as exempting the MSAs from essential functions of the position.

82. Not disputed.

83. Disputed to the extent this fact relies on Stover's declaration. *See* Response to Fact 4, *supra*.

84. Not disputed as a description of CT's documented accommodation of alternating between walking/pacing and sitting in a wheelchair when required to stand in one place. Disputed to the extent this fact relies on Stover's declaration. *See* Response to Fact 4, *supra*.

85. Disputed. Defendant's assertion that CT "is able to perform all the essential functions of her position, including '[parking] lot security and safety walks "relies entirely on the Stover Declaration, *see* Response to Fact 4, *supra*. Further, to the extent Stover's declaration

is to be believed, Stover did not personally supervise CT at the Prescott warehouse and cannot speak to CT's day-to-day activities. Rather, Allison Miller, who worked with CT at the Prescott warehouse from 2018 until CT transferred, testified under oath at her March 17, 2026 deposition that CT "only did the door" and "she didn't do walks. She didn't do anything but check receipts or click people in." (DSOF Ex. 2, Miller Dep. at 45:3-10). Miller further testified: "I never saw her do walks. When I had the board, I never made her do walks because she was in a wheelchair." (*Id.* at 49:1-4). This testimony directly contradicts the Stover Declaration and creates a genuine dispute of material fact.

86. Disputed to the extent this fact relies on Stover's declaration. *See* Response to Fact 4, *supra*. Not disputed that the CT JAM notes state "[i]t was not necessary to review the individual functions of the position of Member Service Assistant based on the restrictions" provided by CT's doctor. Plaintiff notes, however, that this fact is significant: Costco did not subject CT to the same function-by-function comparison it applied to Plaintiff, and determined at the outset of CT's JAM that CT's restrictions were compatible with the position. This different treatment is a disputed fact bearing on whether Costco applied its accommodation analysis consistently.

87. Disputed. Defendant asserts that CT is able to work a flexible schedule, including weekends and evenings, and can work 40 hours per week. The CT JAM notes and February 1, 2017 letter to CT confirm that CT received a specific scheduling accommodation: Costco agreed it "would not schedule [CT] three consecutive eight-hour shifts." (CNS 002183–2184). This scheduling modification - agreed to as part of CT's accommodation - is the same category of schedule adjustment Costco categorically refused to explore for Plaintiff.

88. Not disputed that Willie Munoz is identified as a comparator.

89. Disputed to the extent Shawna Ault's ("Ault") declaration is inadmissible pursuant to Fed. R. Civ. P. 26(a)(3) because Defendant did not disclose Ault as a fact witness until late in the day on the final day of discovery, giving Plaintiff no opportunity to consider whether to depose Ault or serve discovery on Defendant with respect to Ault's involvement. (Scheduling Order, Docket No. 22, at 2; Order, Docket No. 32, at 1; Exhibit 1).

90. Disputed to the extent this fact relies on Ault's declaration. *See* Fact 89, *supra*.

91. Disputed to the extent this fact relies on Ault's declaration. *See* Fact 89, *supra*.

92. Disputed to the extent this fact relies on Ault's declaration. *See* Fact 89, *supra*. Further disputed to the extent this is a material fact; it is not.

93. Disputed. Defendant states Munoz "worked 'the majority of his shifts' at the warehouse entrance." Allison Miller testified at her March 17, 2026 deposition that Munoz "doesn't do hourly building checks. He does the one [walk] on his opening days, but he doesn't do them throughout." (Ex. 2, Miller Dep. at 20:15-18.)  She further testified that Munoz "does not" do walks during the day and that "he doesn't do anything but the opening walk." (*Id.* at 27:10-11.) Miller also testified she had "not once in three years" seen Munoz work the exit door. (*Id.* at 25:16-18.) Whether Munoz performs all essential functions of the MSA position is a disputed factual question.

94. Disputed. Defendant uses Ault's declaration to assert Munoz "has not been excused from performing any such functions." *See* Fact 89, *supra*. However, Miller testified that as a supervisor, she has never instructed Munoz to perform a duty other than working at the entrance door: "Have you ever instructed him to do a job duty other than work at the front door? A. No." (DSOF Ex. 2, Miller Dep. at 13:1-3.) She further testified that the understanding among supervisors was that Munoz stays at the entrance door: "when I have the board, if someone wants to be at the entrance . . . sorry, Willy is there." (*Id.* at 39:12-22.) Whether Munoz was formally or informally excused from performing all essential MSA functions is a disputed question of fact and directly relevant to the question of whether Defendant's overstates the essential functions of the MSA position.

95. Disputed that Munoz's 2024 performance review counseled him to "do more floor walks." This fact relies on Ault's declaration. *See* Fact 89, *supra*. Moreover, Miller testified she was unaware of whether this counseling produced any change in Munoz's behavior, and that "nothing has changed since, that I've witnessed." (DSOF Ex. 2, Miller Dep. 40:15-41:25). Whether Munoz complied with any such counseling is disputed.

96. Not disputed.

## II. PLAINTIFF'S SEPARATE STATEMENT OF FACTS IN OPPOSITION TO SUMMARY JUDGMENT

97.    Plaintiff began her career with Defendant working as a Member Service Assistant. (DSOF Ex. 1, Nelson-Smith Dep. at 104:1-3.)

98.    In her tenure with Defendant, Plaintiff received no counseling or discipline. (Ex. 2, Declaration of Julie Nelson-Smith ("Nelson-Smith Decl.") ¶ 2.)

99.    Plaintiff was diagnosed with Rheumatoid Arthritis in 2011, before she started working for Defendant (Ex. 2, Nelson-Smith Decl. ¶ 3.)

100.    In the two years immediately before Plaintiff went on leave, Plaintiff said: "I did the fax and pull four days a week, and then I would go one day a week up to the door. And typically they most of the time used me at the exit door or the entrance door, but four days a week for about two years." (DSOF Ex. 1, Nelson-Smith Dep. at 104:3-7; Ex. 2, Nelson-Smith Decl. ¶ 5.)

101.    Fax and pull duties were not part of her MSA duties, but Plaintiff remained a Member Service Assistant even when she performed fax and pull duties. (Ex. 2, Nelson-Smith Decl. ¶ 7.)

102.    With respect to Defendant's characterization of the required elements of the MSA position, Plaintiff testified, "I actually just disagree with accommodations. I could have done my job." (DSOF Ex. 1, Nelson-Smith Dep. at 43:15-24.)

103.    Because Plaintiff's disability flared up, Plaintiff acknowledged that she was unable to perform "the lifting of the job for fax and pull" (DSOF Ex. 1, Nelson-Smith Dep. at 104:8-12.) At this time, Defendant required Plaintiff to go on leave. (Ex. 1, Nelson-Smith Decl. ¶ 7.)

104.    Defendant approved Plaintiff for FMLA leave beginning November 15, 2021. (Ex. 2, Nelson-Smith Decl. ¶ 7.) Plaintiff exhausted her FMLA eligibility on June 29, 2022. (Ex. 4, CNS 000997.)

105.    Defendant maintains a Job Analysis document that purports to set forth the essential functions and physical demands of the Member Service Associate position. (DSOF Ex. 16,

CNS 000619-622.)

106.   The Job Analysis document sets fourth five "Essential Functions and Tasks." (DSOF Ex. 16, CNS 000619.)

107.   The first "Essential Function and Task" is to "conduct hourly building safety and security checks consisting of walking the perimeter, pushing carts, picking up stray items, and ensuring lit exit lights. Performs steel safety walk prior to openings. Performs temperature checks with thermometer on all refrigerated equipment during safety walks. Corrects safety and security problems encountered such as spills, trip hazards, and blocked exits. Fills out reports and shows results to the duty manager. Attends warehouse safety meetings. 15%." (DSOF Ex. 16, CNS 000619.)

108.   The second "essential function and task" is: "Maintains the entrance area consisting of opening/closing store doors, greeting members, verifying membership card, offering a cart, directing members, keeping coffee grinder clean, and keeping entrance/exit area clean and dry. Wipes down carts when wet. Uses a handheld clicker to keep count of entering members, reports half-hours to front end managers, and records counts on weekly reports. Hands out flyers and documents to members as needed for warehouse. 40%." (DSOF Ex. 16, CNS 000619.)

109.   Plaintiff testified that she did not have to assist members with items or carts. Rather, "[u]sually you call the lot crew. So you just found -- you find somebody else to help. You know, hey, James, this lady needs help with her water or can you help her to her car. I didn't assist. I just had to keep checking receipts." (DSOF Ex. 1, Nelson-Smith Dep. at 103:9-14.)

110.   Plaintiff also testified that she was "sometimes once a day, sometimes never" asked to perform safety walks. (DSOF Ex. 1, Nelson-Smith Dep. at 100:25-101:4.) Plaintiff noted that "there's four people up there and rotating and stuff sometimes, somebody would do the walk when I would go on break." (*Id.* at 101:5-8; Ex. 2, Nelson-Smith Decl. ¶ 10.)

111.   Plaintiff testified that steel safety walks only occurred if opening the store. (DSOF Ex. 1, Nelson-Smith Dep. at 100:11-14.) Further, Plaintiff did not perform steel safety

walks in the two years before she went on leave. (Ex. 2, Nelson-Smith Decl. ¶ 10.)

112.    Plaintiff also observed Defendant reassign Front End employees, such as cashiers and assistants, to relieve MSAs and close the store. (Ex. 2, Nelson-Smith Decl. ¶ 32.)

113.    The third "Essential Function and Task" states: "Maintains the exit area consisting of smooth exit line flow by prompting members, assisting members with items or cart, plugging in motorized shopping carts, validating receipts to compare to merchandise, and marks receipts with highlighter and thanks members. 40%." (DSOF Ex. 16, CNS 000619.)

114.    Plaintiff confirmed that the third "Essential Function and Task" took up at least 50 percent of her time. (DSOF Ex. 1, Nelson-Smith Dep. at 103:2-3.) Plaintiff said she "was always at the exit door." (*Id.*)

115.    The fourth "Essential Function and Task," consisting of 5% of the job duties, includes "Performs lot rounds consisting of watching the afterhours exit door and driving their personal vehicle around in the lot. Ensures workers make it to their cars safely, watches for members trying to enter the store, and scans for general suspicious behavior. Watches closing managers leave, reports any suspicious activity to duty manager, and calls police if necessary." (DSOF Ex. 16, CNS 000619.)

116.    The Job Assessment also found "Hearing required to converse with members and co-workers and communicate via 2-way radio and phone." (DSOF Ex. 16, CNS 000620.)

117.    Plaintiff testified, with respect to the fourth "Essential Function and Task," "we never did that. We never were part of that. . . . So obviously 5 percent is what they say. I never did that when I worked there." (DSOF Ex. 1, Nelson-Smith Dep. at 51:13-17.; *see also* Ex. 2, Nelson-Smith Decl. ¶ 11.)

118.    The Job Assessment further states that, during Essential Functions, MSAs were required to operate "2-way radio, click counter, private vehicle, Phone, carts, flatbeds, pallet jack, motorized shopping carts." (DSOF Ex. 16, CNS 000619.)

119.    However, Plaintiff testified that "[t]he only hand tools that we had were a clicker that I clicked with my thumb." (DSOF Ex. 1, Nelson-Smith Dep. at 31:25-32:1.) Plaintiff further recalls that she operated a digital thermometer with one hand. (Ex. 2, Nelson-Smith

Decl. ¶ 13.)

120.   Further, Allison Miller testified while reviewing the essential functions of a MSA, "[h]andheld clicker we don't use anymore. Those, we got rid of awhile ago." (DSOF Ex. 2, Miller Dep. at 22:25-23:1.)

121.   Plaintiff noted, with respect to motorized shopping carts, "when they die, you just plug it in." (DSOF Ex. 1, Nelson-Smith Dep. at 103:4-6.)

122.   Further, "[a]s far as the car thing, one of the things Jarod said is I would have to drive a car around the parking lot. That was something in my job description. I worked six years. I never had to go do security with the car." (DSOF Ex. 1, Nelson-Smith Dep. at 32:24-33:3.)

123.   Plaintiff told Defendant during the May 2023 JAM that she had never seen a MSA drive around the lot and that "when she was here they had security that did it." (DSOF Ex. 10, CNS 000415.)

124.   The Job Analysis dictates that Essential Functions 1, 2, and 3 required occasional lifting of up to 25 pounds below the waist, and between the waist and chest. (DSOF Ex. 16, CNS 000619.) The job also required frequent lifting up to 10 pounds between waist and chest. (*Id.*) All three Essential Functions required pushing and pulling up to 48 pounds of force on a flatbed. (*Id.*)

125.   Plaintiff testified that she didn't "agree that we had to lift 20 pounds." (DSOF Ex. 1, Nelson-Smith Dep. at 27:1.) In response to Defendant's question whether the job description was wrong, Plaintiff testified that "it's what it says, but it's not what I was doing when I was doing the job. I wasn't having to lift 20 pounds all day long." (*Id.* at 27:2-5.)

126.   Despite the Job Assessment's allocation of time among the four tasks and the imposition of lifting requirements, Plaintiff testified, "its not all the positions ever were lifting 11 pound. Like the job was 90 percent of the time you're standing at the door you're checking for Costco ID cards, making sure they have it. . . . You're marking things off. So I wasn't [] lifting anything for that job." (DSOF Ex. 1, Nelson-Smith Dep. at 26:17-23.)

127.    Plaintiff asked Jarod McPherson if she could return to work on April 28, 2023 and perform her duties at the entrance and exit areas. (Ex. 5, CNS 001051). Ryan Klee refused to offer Plaintiff Temporary Transitional Duty and insisted on a JAM. (*Id.*)

128.    Ryan Klee told Plaintiff that she would not be able to come back to work with restrictions: "that's what you're going to have to do before you come back. You going to have to have these no restrictions for you to come back. And I left there very upset and crying." (DSOF Ex. 1, Nelson-Smith Dep. at 53:23-54:1.)

129.    Plaintiff believed the only way Klee would allow her to "go back to work is if I had my doctor change the paperwork and that just was not something I was going to do." (DSOF Ex. 1, Nelson-Smith Dep. at 17:25-18:2.)

130.    Defendant's employment policies state that it would "discuss . . . the reasonable accommodations we may be able to provide to enable you to perform the essential functions of your job [and] try to assist you in identifying other jobs that are available[.] (Ex. 6, CNS 000728.)

131.    Plaintiff provided a completed Work Restriction Form that indicated she could walk occasionally, stand frequently, and lift 10 pounds frequently (DSOF Ex. 9, CNS 000408.)

132.    During the JAM meetings, Defendant was not interested in exploring accommodations or reassignments: "I said, do you guys hire people with disabilities. And he right away said, well, yeah, of course, we do. I said, okay, great, what position with my restrictions would you recommend I apply for. I just want to go back to work. And at that point he says, we're getting off tangent. We need to get back to the worksheet. He just bulldozed my question." (DSOF Ex. 1, Nelson-Smith Dep. at 19:7-14.)

133.    Defendant omitted this exchange from its notes of the JAM. (DSOF Ex. 1, Nelson-Smith Dep. at 19:14-15; DSOF Ex. 13, CNS 000638.)

134.    During the May JAM, Costco asserted that pushing a Costco shopping cart from a standstill required 19 pounds of force. (DSOF Ex. 10, CNS 000414.)

135.    Plaintiff could, at all times, push a Costco shopping cart. (Ex. 2, Nelson-Smith Decl. ¶ 17.)

136. Defendant had no suggested modifications or accommodations during the May JAM. (DSOF Ex. 10, CNS 000413-418.)

137. After the May JAM, Jarod McPherson told Plaintiff that she was "a liability to Costco with these restrictions. Costco will not let you come back until you can do your job without restrictions." (Ex. 2, Nelson-Smith Decl. ¶ 18.)

138. During the September JAM, Defendant concluded it could not accommodate Plaintiff's restrictions because "they are looking at the job as a whole." (DSOF Ex. 13, CNS 000633.)

139. Following the September JAM, McPherson handed Plaintiff a blank Work Restriction Form, a copy of the JA, and said, "You know what you have to do Julie. Here is a blank restriction form and here is the answer to your test." (Ex. 2, Nelson-Smith Decl. ¶ 26.)

140. Plaintiff understood McPherson's statement to mean that she needed to have my physician remove or alter her restrictions to match Defendant's Job Analysis requirements. (Ex. 2, Nelson-Smith Decl. ¶ 26.)

141. In an October 19, 2023 email chain, Integrated Leave Director Anthony Stover wrote regarding the pending termination: "I also offered to look at the meeting notes but that I trust that Ryan and Jarod looked at them appropriately as they have done a lot of these reviews. I noted I don't expect that I will have a different opinion but I will look at them just the same." (Ex. 7, CNS 001399). Stover wrote this before receiving and reviewing the November WRF.

142. In the same email, Stover rejected Plaintiff's suggestion to "work at another location in the foodcourt." Stover noted that "Ryan said that would not be allowed. I let her know that would be a question better answered by operations Joe or HR." (Ex. 7, CNS 001399.)

143. Plaintiff testified, with respect to Willie Munoz, that she only sees him working the door. (Ex. 2, Nelson-Smith Dep. at 72:24-25.)

144. Allison Miller, a Costco front-end supervisor who worked with CT at the Prescott #466 warehouse from 2018 until CT transferred, testified under oath at her March 17, 2026

17

deposition, testified that Shaunna Ault, "wants [Munoz] at the entrance door." (DSOF Ex. 2, Miller Dep. at 12:17-19.)

145.  Miller is Munoz's direct supervisor. (DSOF Ex. 2, Miller Dep. at 12:20-25.)

146.  Miller worked at Defendant's locations in Prescott, AZ, and Tucson, AZ. (DSOF Ex. 2, Miller Dep. at 6:13-7:21.)

147.  Miller learned of Munoz's assignment when she became his supervisor: "when I moved here and I started suping on the front end and then I started getting on the board, it was just a thing that was said. I don't even know by who, at one point in the beginning when I first started doing the board of, 'Hey, Willy just does the entrance door.'" (DSOF Ex. 2, Miller Dep. at 13:8-13.). Miller conceded that she doesn't control the board every day, but "that's just how it was, and that's what everyone does. And when he comes back from break, we'll see who is at the entrance door, and then we'll say send us whoever, and then he always takes over for whoever is at the entrance." (DSOF Ex. 2, Miller Dep. at 13:15-19.)

148.  With respect to walks, Munoz only "walks the floor and makes sure there's no hazardous things, and if he finds something, he'll let someone know." (DSOF Ex. 2, Miller Dep. at 14:24-15:1.) Munoz also does not perform hourly building checks or the closing walk. "Someone else does it." (*Id.* at 15:4-7; 20:15-23.) Miller further testified that Willy Munoz "doesn't do hourly building checks. He does the one [walk] on his opening days, but he doesn't do them throughout." (*Id.* at 20:15-17.)

149.  Miller reviewed the JA and ticked off a list of duties that Munoz does not perform: exit duties, lot rounds, making sure workers make it to their cars safely, or watching closing managers leave. (DSOF Ex. 2, Miller Dep. at 23:8-18.) Miller has "[n]ot once in three years" seen Munoz work the exit door. (*Id.* at 25:16-18.) When asked to perform exit duties, Munoz "would get on the electronic scooters and just plug them in. So that's what he does until 9:00 for 15 minutes. He sits on the little scooters and then plugs them in. So technically, he's over on that side, but he's not checking receipts and looking n people's baskets and doing what the exit door does." (*Id.* at 28:4-10.)

18

150.   Miller noted that "there's not much to the beginning walk, as there is during the day, when there's members in the warehouse [and Munoz] doesn't have to do them during the day and -- at all. Every single other member serve employee does have to do them, all day long." (DSOF Ex. 2, Miller Dep. at 16:8-14.)

151.   Miller further testified as to her observations regarding the interplay between the MSA's responsibilities at the door and their responsibilities to clean up: "I would say if you're at the door and you see a spill, you – it's your job to make sure someone gets it taken care of. Whether -- a lot of our members, and Willy would probably do this as well, is stand there if it's right where he's at. Or he'll grab someone from optical or sales who's right there, he'd just call them by name, 'Hey, stand there, I'm going to call for pick up.'" (DSOF Ex. 2, Miller Dep. at 19:19-20:1.)

152.   Moreover, Miller noted that variations in MSA job duties occur between Defendant's store locations. (DSOF Ex. 2, Miller Dep. at 42:7-12.) For example, MSAs would perform lot security at Defendant's store in Prescott, AZ, but in Tucson, AZ, Defendant hired external security with a security vehicle. (*Id.*)

153.   Miller testified, with respect to CT, "she only did the door. At that time we had the clickers, and so she did the entrance or the exit, she did either one, but she sat in a wheelchair the whole time. So she didn't do walks. She didn't do anything but check receipts or click people in." (DSOF Ex. 2, Miller Dep. 45:3-10).

154.   Miller further testified: "I never saw her do walks. When I had the board, I never made her do walks because she was in a wheelchair." (DSOF Ex. 2, Miller Dep. 49:1-4).

155.   Miller also testified that she observed CT "get into the warehouse not in a wheelchair, and then when she left, she walked to her car." (DSOF Ex. 2, Miller Dep. 48:25-49:1). Miller's observations of CT's actual job performance, as a supervisor who worked alongside CT, are direct admissible evidence contradicting the Stover Declaration's assertion that CT performed all essential MSA functions.

156.   CT also was not able to lift weight in accordance with the Job Analysis requirements: "when you're at the door, you can't lift, you know, the stuff in the cart to see

what's underneath boxes. Like you can't -- you know, you can't push carts[.]" (DSOF Ex. 2, Miller Dep. at 53:10-13.)

157.    Defendant was able to, and agreed to, accommodate CT's scheduling needs. In a February 1, 2017 letter from CT's warehouse General Manager to CT, Defendant said that as part of CT's accommodation, "It was agreed upon medical clarification that we would not schedule you three (3) consecutive eight (8) hour shifts." (Ex. 8, CNS 002183). This is a scheduling accommodation of the same type Costco categorically refused to explore for Plaintiff at the any of her JAMs.

158.    At the JAM for CT held on January 30, 2017, the JAM notes state: "It was not necessary to review the individual functions of the position of Member Service Assistant based on the restrictions for [CT] . . . ." (Ex. 8, CNS 002186). By contrast, Costco subjected Plaintiff to a function-by-function comparison against the JA at both JAMs and denied accommodation on that basis. The disparate application of the JAM analysis to CT versus Plaintiff is a genuine dispute of material fact.

159.    Plaintiff's own deposition testimony reflects that she requested accommodation proposals at both JAMs, including suggesting coworker assistance for lifting and a five-hour midday schedule for fine manipulation and grasping restrictions. The September JAM notes confirm these proposals were made. (DSOF Ex. 13, CNS 000633–635). Costco rejected both proposals without documented exploration of whether either would constitute an undue hardship.

160.    During discovery, Plaintiff requested all documents related to any JAM meetings conducted for other employees with disabilities at Defendant's Arizona locations since January 1, 2020. (Ex. 9, Plaintiff's First Set of Requests for Production.)

161.    In response to Plaintiff's discovery request, Defendant produced JAM notes for five employees. (Ex. 10, CNS 002155-002182.)

162.    On December 21, 2021, Defendant denied accommodations to an MSA who suffered from a chronic condition that required frequent bathroom breaks and suggested that taking a break two times per hour could be a potential concern in her job. (Ex. 10, CNS

20

002156.)

163.    On July 31, 2025, Defendant had no suggested accommodations for a Food Service Assistant's 10 pound occasional lifting restriction and a need to use a cane. (Ex. 10, CNS 002167.)

164.    On July 11, 2025, Defendant had no suggested accommodations for a Front End Assistant who could not work in the sun and requested indoor work. (Ex. 10, CNS 002170, 002172.) Despite there being nine essential functions listed on his Job Assessment, Defendant was concerned about the one function that required outdoor work: retrieving carts and flatbeds from parking lots. (Ex. 10, CNS 002172.) Defendant acknowledged that the frequency varied but speculated that the employee "could spend the entirety of his shift outside on cart crew. (*Id.*)

165.    On May 2, 2023, Defendant had no suggested accommodations for a Front End Cashier who sought accommodations for his lifting restrictions. (Ex. 10, CNS 002176-2182.) Defendant rejected the employee's contention that "he really does not do anything with carts but once in awhile he may have to push six to eight carts in early morning. (*Id.*) Defendant also ignored the employee's assertions that he had not worked outside in years, wanted to be accommodated by not having to push 10-15 carts at a time outside, had been on Temporary Transitional Duty ("TTD") for two years, and had not worked a register for 2.5 to 3 years. (*Id.*)

166.    Defendant accommodated one employee, an MSA, by permitting her to work six hour shifts no more than three days a week and five hour shifts the other days. (Ex. 10, CNS 002159-2161.)

167.    Defendant's stated reason for terminating Plaintiff's employment included the time Plaintiff spent on FMLA-protected leave. As stated by Jared McPherson: By that time, November 2023, Nelson-Smith had been on a leave of absence *for two years . . . .*" (DSOF Ex. 4, McPherson Decl. ¶ 9. (emphasis added).)

168.    Similarly, McPherson told Plaintiff on September 26, 2023, that she might be terminated in part because she has "been on a leave of absence since November 15, 2021."

(Ex. 9, CNS 001290).

169.    Parisi's notes from the JAM meeting is consistent: Plaintiff was faulted for being on a "Leave of Absence since November 15, 2021[.]" (DSOF Ex. 13, CNS 000636.)

170.    Plaintiff began receiving social security benefits in 2024, well after her termination from Defendant in November 2023. (Ex. 2, Nelson-Smith Decl. ¶ 31.)

RESPECTFULLY SUBMITTED this 30th day of June 2026.

FERNANDEZ WATTS LAW PLLC

/s/ *Mark Sorokin*
5040 E. Shea Blvd. Ste. 272
Scottsdale, Arizona 85254
*Attorneys for Plaintiff*